**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARK J. LEACH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **Civil Action No. 01-2364** |
| | ) |
| **NORTHWESTERN MUTUAL** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

**OPINION and ORDER**

COHILL, D.J.

Plaintiff Mark J. Leach has filed this action against Northwestern Mutual

Insurance Company ("Northwestern" or the "insurer"), seeking payments under a

disability insurance policy (the "Policy") issued by the defendant.  Leach alleges breach

of contract, bad faith under 42 Pa.C.S. § 8371, and deceptive business practices in

violation of 73 Pa.C.S.A. § 201-1 *et seq.*

Northwestern has filed a counterclaim for damages for breach of contract, unjust

enrichment, misrepresentation, and fraud.

We have jurisdiction under 28 U.S.C. § 1332, the federal diversity statute.

Plaintiff is a resident of the Commonwealth of Pennsylvania, and Northwestern has its

principal place of business in Milwaukee, Wisconsin and is incorporated in that state.

The amount in controversy exceeds $75,000.00.  In exercising diversity jurisdiction, this

Court must apply the substantive law of the state in which it sits. *Bensalem Township v.*

*Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1308 (3d Cir.1994).  Neither party disputes

that Pennsylvania law applies.

Before the Court are motions for summary judgment filed by both parties (Doc. 17

and Doc. 19), seeking a determination of liability, with accompanying briefs, briefs in

opposition, replies, and appendices.  Having now considered the parties' arguments and

the applicable law, for the reasons set forth below we will deny plaintiff's motion in its entirety, and grant defendant's motion in part and deny it in part.  Plaintiff's breach of contract claim and all five counts of defendant's counterclaim may proceed to trial by jury.

## I.  Background

Plaintiff Mark Leach purchased  disability insurance policy No.  D 558 603 from defendant Northwestern on October 2, 1987.  (Def.'s Ex. 1).  At that time, Leach was the principal owner and CEO of M&K Electrical Company, which performed commercial electrical work and had approximately 100 employees.  When asked about his duties as company president of M & K Electrical on his policy application, plaintiff stated that he spent 100% of his time "Running & Planning & Analysis. Operations Proposals of Bus. Operations." (Def.'s Ex. 3).

The Policy provides for benefits when the insured is totally or partially disabled.

Total disability is defined as follows:

> Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

(Def.'s Ex 2 (the "Policy"), Section 1.2).

The Policy provides for a proportionate benefit for partial disability.  An insured is partially disabled when:

> a.    he is unable: to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and,
> b.    he has at least a 20% Loss of Earned Income.

(Policy, Section 1.3).

The plaintiff does not claim partial disability.  (Pl.'s Dep. at 321).

The Policy provides that Northwestern may have the insured examined by a

physician of its choice as often as reasonably necessary in connection with a claim. (Policy, Section 4.2).

Leach suffered a heart attack in May 1991, and began receiving disability payments under the Policy that September.

Written proof of disability must be given within 90 days of the end of each monthly period for which benefits are claimed. (Policy, Section 4.3). Plaintiff signed and submitted a Request for Continuance of Disability Benefits each month, which included the following verification: "I declare that all of the above answers are complete and true to the best of my knowledge and belief. I understand that the company reserves the right to require further proof." (Request for Continuance forms Def.'s Ex. 8-20).

The forms stated that Leach was prevented from working due to various medical or psychological conditions: fatigue, exhaustion, continuous pain, advice of his physicians, inability to concentrate, and a muscle condition. The forms further stated that the plaintiff had not performed any work of any kind at his prior occupation or at any other occupation. Leanne Pomponio was a secretary for M & K Electrical and M & K Construction Group. Between 1995 and 1997, Pomponio typed up the Request for Continuance forms using information Leach provided. (Pomponio Dep. Def.'s Ex. 7 at 62-70). Pomponio testified that these statements were not accurate, since Leach was doing some work at his former occupation. (Pomponio Dep. Def.'s Ex. 7 at 62-70).

Northwestern paid the plaintiff disability benefits under the Policy for nearly ten years.

In mid-1998, Northwestern began a review of the plaintiff's claim. Diane Pautz was the claim administrator. During the investigation into Leach's claim, the insurer analyzed the information provided on Leach's Request for Continuance of Disability Benefits forms; his medical records, including reports from various physicians and independent medical examinations; updated limitations and restrictions on his activities;

his financial records; and confirmation of his daily activities. ( Compl. Ex. A). Northwestern reviewed medical records from Leach's own treating physicians, including Frederick W. Crock, M.D., his cardiologist; Dr. Pellegrini; Thomas L. Ulciny, M.D., Ronald G. Cercone, M.D.; Omar I. Bhutta, M.D., his psychiatrist; Neil A. Busis, M.D., his neurologist;  L. Alan Wright, M.D., his psychiatrist; Barbara A. Shapiro, M.D.; Mary Ann Miknevich, M.D.; James J. McCague, M.D.; Theodore R. Gelet, M.D.; and, Catherine D. Ravella, R.N., his therapist.  Plaintiff was examined or his medical records were reviewed by the following consulting physicians and independent medical examiners: Michael J. Logan, M.D.; Jill F. Mocarski, M.D.; Gerald Goldstein, Ph.D., a neuropsychologist who tested Leach but did not physically examine him; Stuart L. Silverman, M.D., who performed an independent neurological examination; Robert M. Wettstein, M.D, who performed an independent psychiatric examination; Theodore Million, Ph.D.; and Sara Swanson, Ph.D.

As part of its investigation into Leach's disability claim, Northwestern retained Tracy L. Coenen, S.C., a certified public accountant, to determine the plaintiff's business ownership and involvement.  (Def.'s Ex. 4).  Among other business interests, in 1998 Leach became an owner and partner in the Monterey Marina, Restaurant & Lounge in Monongahela, Pennsylvania ("the Marina").  At the same time, he became the third shareholder in two separate corporations: Jay-Will Corporation and Kasko Enterprises, Inc.  He also formed a corporation called Global Marine to construct new boat docks at the Marina.  (Kasko Dep. at 21, 88, 46, 48).

Leach himself testified that he was a paid consultant for M & K Electric after leaving the company.  (Leach Dep. at 300-303).  Thereafter, he consulted on electrical contracts for M & K Construction, including reviewing bids, contract documents, and design blueprints.  (Leach Dep. at 323-327).  Some of the Request for Disability forms he submitted in 2000 and 2001 state that he was consulting at M & K Construction, and

4

being paid $1,000.00 a month.  (See, e.g. Def.'s Ex. 17, Request form 1-2-01, consulted for 1-2 hours, financial statement shows payment of $1,000.00; Ex. 19, Request form 11-2-00, consulted once a week, financial statement shows payment of $1,000.00; similar pattern shown in Ex. 20 for July and August of 2000).   He also developed a mortgage purchasing business which was ultimately unsuccessful.  (Leach Dep. at 298-299).  Plaintiff's therapist, Dr. Ravella, testified that he stated in June of 1993 that he was working twenty hours a week in the mortgage business, and Leach does not dispute this statement.  (Leach Dep. at 311-313).

Northwestern also had surveillance conducted regarding Leach's daily activities as part of its investigation.  (Def.'s Ex. 61-63).

 Additionally, Northwestern interviewed the plaintiff and some of his former co-workers on several occasions.  Those interviewed included Denise McHugh, a Monterey Marina employee, who told investigators that Leach was at the Marina seven days a week; he would arrive by eight or nine a.m. and stay until late at night or early the next morning.   McHugh stated that he was "very active" in the hiring and firing of employees, and had total control of the business' books.  (Def.'s Ex. 63).   John Kasko, a co-owner of the Monterey Marina, told Northwestern's investigators that Leach made changes in the staff and created plans for expanding the restaurant and marina.  He also stated that Leach was at the Marina from morning till night, and that he continued to run M & K Electric; his secretaries would bring papers to sign to him at the Marina, and he met with M & K employees on a regular basis.  (Def.'s Ex. 64; Kasko Dep. at 31, 60-61).

Following this investigation, the insurer stopped paying disability benefits in April 2001.  Moreover, Northwestern demanded that it be reimbursed in the amount of $219,271.60 for benefits paid since September of 1998, including monthly disability benefits and premiums that had been waived on other policies.  (Compl. ¶¶ 9, 10).  Diane Pautz used records showing Leach's involvement in the expansion of the Marina to

determine the date from and after which Northwestern concluded that the plaintiff was not disabled.

Plaintiff filed this action to recover benefits under the Policy.  Leach alleges breach of contract, bad faith under 42 Pa.C.S. § 8371, and deceptive business practices in violation of 73 Pa.C.S.A. § 201-1 *et seq.*

Northwestern has filed a counterclaim for damages for breach of contract, unjust enrichment, misrepresentation, and fraud.  It further seeks a judgment that two other policies issued to the plaintiff lapsed as of May 2, 2001, and that Leach was not disabled under those policies from September 1998. These are the Additional Purchase Benefit Rider, Policy No. D837021, which issued on August 21, 1991 (Def.'s Ex. 74), and a Disability Insurance Policy No. D558603 (Def.'s Ex. 75).  Northwestern waived the premiums on these policies while paying disability under Policy No. D 558 603.   On April 2, 2001, Dianne Pautz  notified the plaintiff that he must reimburse the insurer for the amount of the waived premiums, and that the policies would lapse if the amount was not paid.  Plaintiff did not make any payment.  (Counterclaim at ¶¶53, 54).

Both parties have filed motions for summary judgment as to all claims.

## II.  Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1989).  "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is "genuine" only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  A factual dispute is

"material" only if it might affect the outcome of the suit under governing law. *Id.* at 248.

A court considering summary judgment must examine the entire record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Anderson*, 477 U.S. at 248. The court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (*quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

The moving party bears the initial responsibility for demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. This burden may be met by showing that there is an absence of evidence in the record to support the non-moving party's case. *Id.* at 325. However, once the moving party has properly supported its motion, the opponent must provide some evidence that a question of material fact remains for trial. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the non-moving party may not rest upon mere allegations, general denials, or vague statements. *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993). The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita*, 475 U.S. at 486. To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant. *Celotex*, 477 U.S. at 321 n. 3. The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *Anderson*, 477 U.S. at 248-49. In other words, the non-moving party must go beyond the pleadings and show, through its own affidavits or by the depositions, answers to interrogatories and admissions on file, the specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

### III. Analysis

At the heart of this case is whether the plaintiff qualified for benefits because he

was totally disabled as defined in the Policy.  Therefore, before considering the specific arguments presented by the parties' respective motions for summary judgment we must determine the time frame for the Initial Period of the Policy, because the Policy definition of "total disability" changes after that period ends.  Interpretation of an insurance contract is generally a question of law for the court to decide.  *Standard Venetian Blind Co. v. American Empire Ins.*, 469 A.2d 563, 566 (Pa. 1983).

The Policy provides that for the first 60 months, a claimant is considered "totally disabled when he is unable to perform the principal duties of his occupation."  After this Initial Period has run, an insured will be considered totally disabled only if he is "unable to perform the principal duties of his occupation **and** is not gainfully employed in **any** occupation."  ( Policy, Section 1.1, emphasis added).

Northwestern asserts that the Initial Period in the Policy was 60 months from October 2, 1987, which is the date the Policy began.  (Def.'s Br. Doc. 20 at 5).   Leach argues that the Initial Period begins in 1991, when he began receiving benefits, and we agree.  The Policy unambiguously states that the Initial Period starts on the Beginning Date, which is further defined as the 91st day of disability in the first 180 days after the start of disability.  This is the date on which benefits begin to accrue.  The Initial Period continues, while the insured is disabled, for the length of time in shown in the Policy, which in this case  was 60 months.  (Policy, Section 1.1, and p. 3).

It is undisputed that Leach suffered a heart attack in May 1991, and began receiving disability payments under the Policy that September.  Therefore, the Initial Period would  run for sixty months from that date, or until September 1996.  Indeed, despite the position taken by the insurer in its brief, Dianne Pautz's letter summarizing Northwestern's decision to deny benefits states that the five-year Initial Period of plaintiff's policy ended on September 9, 1996.  (Def.'s Ex. 73).

Accordingly, we conclude as a matter of law that before September 1996, to be

considered totally disabled and entitled to benefits within the meaning of the Policy, Leach need only have been unable to perform the principal duties of his prior job. However, after September of 1996, he must have been unable to perform the principal duties of his prior occupation and must not have been gainfully employed in any other occupation.

The Policy also provides for a proportionate payment if the insured is partially disabled.  An insured is partially disabled when he is unable to perform one or more of the principal duties of his occupation, or to spend as much time at his occupation as he did before the disability started, and he has at least a 20% loss of earned income.  (Policy, Section 1.3).  There is no record evidence that either the plaintiff or the defendant discussed payments for partial disability, and the plaintiff testified that he is seeking payment in this action only for full, not partial, disability.  (Pl.'s Dep. at 321).

Mindful that the criteria under which the plaintiff could receive total disability benefits are different before and after September of 1996, we turn to the parties' motions for summary judgment.

### A.  Plaintiff's Breach of Contract Claim

### (1)  Plaintiff's Motion for Summary Judgment

Leach asserts that summary judgment is proper on his breach of contract claim because Northwestern stopped paying disability even though it is undisputed that he has been continuously disabled since May of 1991.  Northwestern disagrees, and states that it ceased paying benefits under the Policy only when it became clear that Leach was no longer disabled.

To maintain a claim for breach of contract under Pennsylvania law, a plaintiff must show (1) the existence of a valid and binding contract, (2) that he has complied with the contract and performed his own obligations under it, (3) fulfillment with all conditions precedent, (4) a breach of the contract, and (5) damages.  *Pierce v.*

*Montgomery County Opportunity Bd., Inc.*, 884 F.Supp. 965 (E.D.Pa.1995).

To support his position that his continuous disability is undisputed, plaintiff insists that "all of his treating physicians have consistently reported that he is suffering from disabilities which would not allow him to perform all of the duties of his former occupation (.)" (Pl.'s Br. Doc. 18 at 3).  He submits the affidavits of Dr. Bhutta, Dr. Crock, and Catherine D. Ravella, R.N., which each attest that he cannot work the same hours he did prior to 1991. (Pl.'s Ex 2, 3, 4).   Plaintiff further contends that independent medical examiners Goldstein and Wettstein also determined that he could not return to his previous occupation, but that Northwestern ignored their reports, and instead relied on Drs. Swanson and Logan, who never examined him.  (Pl.'s Br. Doc. 18 at 4; Pl.'s Mot. Doc. 17).

He also cites the progress notes of Bertrand E. Stolzer, M.D., dated October 16, 2002, which were not part of the record Northwestern considered when it decided to end benefits.  (Pl.'s Ex. 5).   Dr. Stoltzer was plaintiff's rheumatologist.  After examining Leach, Dr. Stolzer concluded that his symptoms were figbromyalgic in nature, and that he was depressed.  On November 11, 2002, Dr. Stoltzer stated his opinion that "the patient most certainly cannot do his usual job as an electrical contractor working heavy duty and line work at times.  He is symptomatic at the present time and most certainly he has to improve before any gainful employment can be entertained.  He certainly cannot do his usual job, and whether he will eventually be a candidate for light and more sedentary type of job, is problematic."  (Pl.'s Ex. 5).

Northwestern counters that these affidavits do not address both of the key issues which determine whether an insured is disabled within the meaning of the Policy: whether Leach is unable to perform the principal duties of his former occupation, or whether he has been gainfully employed in any other occupation.  We agree with the defendant as to the latter point. The affidavits only speak to whether he can perform the

duties of his former occupation.

Defendant also points to record evidence from these individuals which it argues contradicts the conclusions reached in their affidavits. Dr. Bhutta's records dated 8/2/94 state that plaintiff was working part-time. (Def.'s Ex. 25). Dr. Crock, who was Leach's treating cardiologist, told the defendant in October of 1998 that Leach "would be able to pursue his business as President and Chief Operating Officer of an electronics company, as he is not doing any type of physical work, and the amount of physical work that he does seem to do, in terms of supervising, would be within the realm of his functional status on the treadmill from a purely cardiac standpoint." (Def.'s Ex. 37 at 1549). And treatment notes from Ms. Ravella, who was plaintiff's therapist, portray the plaintiff from March 1996 through January 2000 as an individual who was actively directing several lawsuits, spending time on his boat, traveling to Russia as a consultant, and who was involved in the business affairs of the Marina, including firing employees. (Def.'s Ex. 26-31; 33-35). As we interpret the Policy, Dr. Bhutta's cited testimony does not affect whether the plaintiff was permanently disabled before September 1996. Ms. Ravella's testimony suggests that the plaintiff may have been employed after that date, but does not contradict her affidavit statement that he cannot return to his pre-1991 occupation. Dr. Crock's testimony, however, is at odds with his affidavit.

In addition, Northwestern points to the testimony of Drs. Busis, Miknevich, and Wright, each of whom treated the plaintiff, as examples of medical testimony from which a jury could conclude that he was not disabled. Dr. Busis noted on October 20, 1997, that the plaintiff continued to complain of symptoms, but nevertheless states that he was not weak. (Def.'s Ex. 40). Nerve conduction tests and an EMG, performed in June of 1997, were normal. (Def.'s Ex. 41). Dr. Busis was "not at all certain" that the plaintiff "has any muscle disease at all." (Def.'s Ex. 42). Dr. Miknevich evaluated the plaintiff and found no neuromuscular deficits despite his complaints of pain. (Def.'s Ex. 43). Dr.

Wright, Leach's treating psychiatrist, concluded that as of September 1998 Leach had no psychiatric limitations or restrictions.  (Def.'s Ex. 45).

We need not detail the medical testimony any further because it is clear that the medical opinions in this case conflict.   Medical evidence in the record shows that the defendant saw a variety of specialists and underwent various medical tests in an effort to determine the cause of his pain and fatigue.  His physicians generally noted that test results were negative or inclusive, yet they also acknowledged that his symptoms continued.  Some of these physicians concluded that he was unable to work as he had in 1991.   There is certainly medical evidence from which a reasonable jury could find that the plaintiff was unable to work at his previous occupation, as well as evidence from which a factfinder could conclude that he was not disabled within the meaning of the Policy and therefore that Northwestern did not breach the contract when it ceased paying benefits.  These disputed issues of material fact preclude summary judgment in favor of the plaintiff.

We are satisfied that the defendant has met its burden of indicating disputed issues of material fact as to whether Leach was disabled as defined by the Policy, and accordingly we will deny plaintiff's motion for summary judgment on his breach of contract claim.

### (2) Defendant's Motion for Summary Judgment

Defendant has also moved for summary judgment on plaintiff's breach of contract claim.  By its motion, Northwestern argues that summary judgment on this claim is appropriate because there are no disputed issues of material fact regarding the insurer's compliance with the terms of the Policy.

As we have said, to establish a claim for breach of contract, a plaintiff must show (1) the existence of a valid and binding contract, (2) that he has complied with the contract and performed his own obligations under it, (3) fulfillment with all conditions

12

precedent, (4) a breach of the contract, and (5) damages.   *Pierce v. Montgomery County Opportunity Bd., Inc.*, 884 F.Supp. 965 (E.D.Pa.1995).

Northwestern explains that it paid benefits "until the evidence that Plaintiff was not disabled and had not been disabled for some time became overwhelming." (Def.'s Br. Doc. 20 at 34). Northwestern asserts that stopping benefits after determining that Leach was no longer disabled is not a breach of the Policy.   Northwestern provides a detailed review of the evidence produced during its investigation of plaintiff's claim, and points to evidence it contends shows that Leach was either continuing to work at his former occupation, or was engaged in managerial duties at the Marina that were similar to those of his former occupation as CEO of M & K Electrical.

This evidence includes the deposition testimony of Leanne Pomponio, a secretary for M & K Electrical and M & K Construction, who typed up the plaintiff's Request for Continuance of Disability forms between 1995 and 1997. Contrary to the information Leach provided on the forms, Pomponio testified that the plaintiff was doing some work at his former occupation. (Pomponio Dep. Def.'s Ex. 7 at 62-70; Request for Continuance of Disability form dated May 14, 1997 and December 2, 1997, Def.'s Ex. 8, 9). These dates are well after the end of the Initial Period on December 10, 1996.

Northwestern also refers us to the insurer's interviews with Marina employees. Meghan Dean, a waitress and bartender at the Marina,  described Leach as her boss and said that he took an "active role" in the Marina's affairs. (Dean interview, Pl.'s Ex. 23 at 6610). Denise McHugh stated that Leach was at the Marina nearly every day before he became a partner, and that after he became a partner "he spent seven days per week at the Marina and would arrive by 8-9 am and stay until close." (McHugh interview, Def.'s Ex. 63). McHugh described him as being "very active in the hiring and firing of employees" with "total control over the books."   "Mark was essentially the manager of the Marina portion of the restaurant. . .."  McHugh stated that the plaintiff supervised the

13

construction workers who were expanding the Marina.  (*Id.*)

John Kasko was one of Leach's partners in the Marina.  Kasko testified that the plaintiff was there every day, arriving at about 7:30 and staying until closing.  (Kasko Dep. Def.'s Ex. 5 at 28-29).  He held meetings with M&K employees, gave orders to other Marina employees,  reviewed drawings for the expansion, and gradually assumed control of Marina operations.  (*Id.* at 31-32, 38-42).

To defeat defendant's motion for summary judgment on his breach of contract claim, Leach must now point to specific record evidence from which a reasonable jury could conclude that he was neither performing the duties of his former occupation nor gainfully employed at any job.

Plaintiff cites to Pomponio's deposition testimony that before his heart attack, Leach "worked a lot on getting leads for contracts, doing bidding, some estimating, supervising, overseeing the project field and the project managers, scheduling the contracts to make sure we were online with our progress on the jobs.  He reviewed the financial information and he did go out and do some site bids in the field where the jobs were at."  (Pomponio Dep. Def.'s Ex. 7 at 10).   In contrast, after his heart attack, Pomponio testified that his hours were "drastically" cut back.  (*Id.* at 11).

Leach also asserts that his former position as principle owner and CEO of M & K Electrical Co. required physical labor which he can no longer perform.  Leach  points to Pomponio's testimony that he worked in the field before his heart attack but after that was unable to return to his previous work. (Pomponio Dep. Def.'s Ex. 7 at 11).  He also points out that defendant's surveillance tapes fail to show any physical activity on his part.  (Pautz Dep. Def.'s Ex. 73 at 57).   Northwestern disputes this point, and emphasizes that neither the application for disability insurance nor any of Leach's claims submissions indicate that physical activity was part of his position as owner and CEO of M & K Electrical. Moreover, Leach admitted engaging in some activities that could be seen as

14

strenuous, including skiing, boating, travel, and hunting.  (Pl's Dep. at 279, 334, 338).

We have previously concluded that the medical testimony and opinions in this case are mixed.   We find that there are disputed facts, as well, regarding the physical demands of the plaintiff's previous occupation, and whether he was able to perform the duties of that job or was in effect performing them at the Marina, while he was receiving payments for full disability. To give but one example, Plaintiff's Request for Disability forms dated April 17, 2000 and May 19,2000 stated that he had performed no principal duties of his previous occupation.  (Def.'s Ex. 13, 14).  At the same time, there is evidence that he was performing managerial duties at the Marina.

As to whether Leach was gainfully employed in any occupation, it is undisputed that many of Leach's Request for Benefits forms indicate that he was receiving small amounts of income for serving as a consultant for M & K Construction. For example, the forms dated July 2, 2000 and August 16, 2000 indicate that Leach was working once or twice a week, for two or three hours at a time, as a consultant to M & K Construction. The financial statements filed with the insurer for July and August of 2000 state that he received $1,000 each month for this work.  (Def.'s Ex. 20; *see, also* Def.'s Ex. 17, 19).

Leach points out that, under the Policy, he was "entitled to 100% benefits, provided that his loss of income is at least 80% of what it was prior to disability."  (Pl.'s Br. Doc. 25 at 6).  Certainly the Policy unambiguously provides that an insured may receive partial benefits if unable to work as before disability, and if the loss of income is at least 80%. (Policy, Ex. 2 at ¶ 1.3).  So, although the record includes evidence from which a reasonable jury could conclude that Leach was working after September 1996, the Policy anticipates this by providing for a proportionate benefit for partial disability. We find that whether Leach was gainfully employed in any occupation in violation of the Policy remains a question of fact for the jury to decide.

Plaintiff has shown that disputed issues of material fact remain for trial, and we

will deny defendant's motion for summary judgment on plaintiff's breach of contract claim.

### (3)  Conclusion

While there is certainly evidence from which a reasonable jury could conclude that at some point Leach was no longer disabled, and thus it was not a breach of contract for Northwestern to discontinue paying full disability benefits, there are factual disputes regarding the ultimate issue of his disability.  Such disputes are for a jury to decide.  For the reasons set forth above we will deny both plaintiff's and defendant's motions for summary judgment on plaintiff's breach of contract claim.

### B.  Bad faith in violation of  42 Pa. C.S.A. § 8371

We turn now to the parties' respective motions for summary judgment on plaintiff's claim that the defendant acted in bad faith in violation of the Commonwealth's bad faith statute, 42 Pa.C.S. § 8371.  Leach argues that Northwestern breached its duty of good faith by disregarding objective medical evidence that he was disabled and relying, instead, on the opinions of Sara Swanson and Michael Logan; by initiating surveillance of his activities;  and by filing a request for investigation of insurance fraud with the Pennsylvania Attorney General's office.  (Pl.'s Mot. Doc. 17).

By its motion, Northwestern asserts that there is no competent evidence to support this bad faith claim.  (Def.'s Br. Doc. 20 at 34).

Under Pennsylvania law, an insurer owes a duty of good faith to its insured. *Parasco v. Pacific Indemnity Co.*, 870 F.Supp. 644, 646 (E.D. Pa. 1984) (citing *Fedas v. Insurance Co. of Pennsylvania*, 151 A. 285, 286-87 (Pa. 1930)).   This duty of good faith includes the duty to investigate a claim fairly and objectively, along with the obligation to reject claims only with good cause.  *Parasco*, 870 F.Supp. at 646 (citing *Diamon v. Penn Mut. Fire Ins. Co.*, 372 A.2d 1218, 1226 (Pa. Super. 1977)).

An insured claiming bad faith handling of an insurance contract must show that

16

(1) the insurer lacked a reasonable basis to deny benefits under the policy; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997). The plaintiff must prove its claim by clear and convincing evidence. *Id*. Bad faith has been defined as "any frivolous or unfounded refusal to pay proceeds of a policy. . . For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 697 (Pa.Super 1994).

An insurer defending a bad faith claim can prevail on summary judgment by demonstrating that it had a reasonable basis for its decision to deny benefits. *Quaciari v. Allstate Ins. Co.*, 998 F.Supp. 578, 581 n. 3 (E.D.Pa. 1998). Courts have concluded that where an insurance company conducts a substantial, thorough investigation and uses this as the basis for deciding to continue or discontinue benefits, that investigation establishes a reasonable basis that defeats a bad faith claim. *Seidman v. Minnesota Mut. Life Ins. Co.*, 40 F.Supp.2d 590 (E.D. Pa. 1997). Indeed, courts have found that a reasonable investigation has occurred even though some medical testing may have been inadequate, and even where the physicians disagreed as to whether the plaintiff was disabled. *Id.* The question "for bad faith liability is not whether the insurer is correct, but whether there exists a 'reasonable basis for denying benefits under the policy.'" *Krisa v. Equitable Life Assurance Society*, 113 F.Supp.2d 794, 703 (M.D. Pa. 2000) (quoting *Keefe v. Prudential Property & Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000)).

Leach has not met his burden of pointing to clear and convincing evidence from which a reasonable jury could conclude that Northwestern did not have a reasonable basis for denying his disability benefits, and that it acted with knowledge or reckless indifference to the lack of such a basis.

17

Leach asserts that the insurer recklessly requested information from physicians and attempted to manipulate the results of their reports.  Plaintiff argues that Northwestern denied disability payments based only on the opinion of three of its doctors, Mocarski, Logan and Swanson, who never spoke to or examined the plaintiff, while ignoring the opinions of his treating physicians.   However, although Leach strongly disagrees with the conclusions reached by some of the medical reports in evidence in this case, this is not evidence that the insurer failed to conduct a reasonable investigation.  It is simply evidence that the medical opinions sometimes conflicted with each other, a finding which we have used as a basis for denying summary judgment on the breach of contract claim.  It is not evidence from which a reasonable jury that Northwestern acted in bad faith.

The record in this case clearly establishes that the insurer conducted a thorough investigation into plaintiff's disability claim, including evaluating medical opinions from Leach's own physicians as well as from its own independent medical examiners.  This investigation is detailed in claims administrator Diane Pautz's letter to plaintiff's counsel, dated April 2, 2001, which is attached to the Complaint as Exhibit "A".  Pautz explained that Northwestern's investigation analyzed the information provided on Leach's Request for Continuance of Disability benefit forms; his medical records, including reports from various physicians and independent medical examinations; updated limitations and restrictions on his activities; his financial records; and confirmation of his daily activities. ( Compl. Ex. A). The investigation included surveillance of plaintiff's activities, as well as interviews with Leach and some of his former co-workers.  We conclude that Northwestern conducted a thorough review of Leach's disability claim and therefore had a reasonable basis for its decision to deny benefits.

Plaintiff further argues that the insurer acted in bad faith by contacting the attorney general's office regarding insurance fraud.  He cites to no authority to support his

argument that this is evidence of bad faith, and we have found none in our research. Northwestern concluded that Leach had been dishonest in submitting his claims forms, and this was one of the bases for denying his benefits. Reporting this to the attorney general is not evidence of bad faith under the statute.

Finally, plaintiff argues that the insurer acted in bad faith because it filed a counterclaim in this action, and because it withheld delivery of the surveillance tapes until the conclusion of depositions. Neither of these shows that Northwestern acted in bad faith. Again, there is simply no authority to support Leach's contention that filing a counterclaim in accordance with the Federal Rules of Civil Procedure is evidence of bad faith. Furthermore, the insurer was not required to provide the surveillance tapes until after depositions were taken. *Snead v. American Export-Isbrandtsen Lines, Inc.*, 59 F.R.D. 148 (E.D.Pa. 1973).

Plaintiff has not met his burden of establishing his claim by clear and convincing evidence. Indeed, we agree with Northwestern that the plaintiff has presented **no** competent evidence from which a reasonable jury could find that the insurer acted in bad faith in violation of 42 Pa. C.S.A. § 8371. Northwestern has provided ample documentation showing that it conducted an extensive investigation into Leach's claim, and therefore had a reasonable basis for denying benefits. This is sufficient to defeat a claim for bad faith. Accordingly, we will deny plaintiff's motion for summary judgment on this claim, grant defendant's motion for summary judgment on this claim, and dismiss this claim as a matter of law.

### C. Unfair deceptive business practices in violation of 73 Pa.C.S.A. § 201-1

Plaintiff further alleges that Northwestern has committed unfair and deceptive business practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). Both parties have moved for summary judgment on this claim.

Leach asserts that the insurer violated the consumer protection law by violating the Unfair Insurance Practices Act ("UIPA"), 40 Pa. C.S. §§ 1171.1 *et seq.* (Compl. at ¶ 16(a)). However, the Pennsylvania Supreme Court has held that there is no private right of action under the UIPA. *D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 431 A.2d 966, 970 (Pa. 1981). *See also Smith v. Nationwide Mutual Fire Ins. Co.*, 935 F.Supp. 616, 620 (W.D.Pa. 1996) (collecting cases). The UIPA can only be enforced by the state insurance commissioner. *Great West Life Assurance Co. v. Levithan*, 834 F.Supp. 858, 863 (E.D.Pa. 1993) (citing *Pekular v. Eich*, 513 A.2d 427, 429 (Pa. Super. 1986)). Under this authority, insofar as plaintiff's claim for bad faith is based upon a violation of the UIPA, it must fail as a matter of law.

The plaintiff further argues that the defendant violated the UTPCPL through the same conduct that caused an alleged violation of Pennsylvania's bad faith statute: by discontinuing disability payments despite determinations by examining physicians that he continued to be disabled. Leach contends that Northwestern disregarded these medical reports, and continued to have the plaintiff examined until it received a report that concluded he was disabled. (Compl. at ¶¶ 12-15). He also argues that the insurer promised to pay benefits that it had no intent of paying. Northwestern asserts that there is no competent evidence that it violated the statute.

The UTPCPL prohibits a seller of goods and services from engaging in any "fraudulent conduct which creates the likelihood of confusion or misunderstanding." *Schroeder v. Acceleration Life Ins. Co. of Pennsulvania*, 972 F.2d 41, 46 (3d Cir. 1992). The UTPCPL provides a private cause of action for misfeasance or malfeasance, or the improper performance of a contractual obligation. *Horowicz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995) (citing *Gordon v. Pennsylvania Blue Shield*, 548 A.2d 600, 604 (1988)).

There is no right of recovery under the statute, however, for nonfeasance, which is

the failure to perform a contractual duty. *Id.* Most courts considering the issue have held that an insurer's failure to pay benefits under a policy constitutes nonfeasance, and therefore is not actionable under the UTPCPL. *See, e.g. Horowitz*, 57 F.3d at 307; *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F.Supp. 709, 717 (M.D.Pa. 1995); *Parasco v. Pacific Indem. Co.*, 870 F.Supp. 644, 648 (E.D.Pa. 1994); *Gordon*, 548 A.2d at 602-04.

However, the statute has been interpreted to include "an insurer's promise to pay benefits it has no intention of paying." *Krisa v. Equitable Life Assurance Society*, 113 F.Supp.2d 694, 706 (M.D.Pa. 2000) (quoting *Parasco v. Pacific Indemnity Co.*, 920 F.Supp. 647, 656 (E.D.Pa. 1996)).

Courts considering whether an insurer promised to pay benefits with no intention to do so have found that the UTPCPL could be violated where plaintiff produced evidence of fraudulent inducement to purchase the insurance policies at issue (*Krisa*, 113 F.Supp.2d at 706); evidence that the insurer changed the wording of an insurance certificate without informing the policy holder (*Schroeder v. Acceleration Life Ins. Co.*, 972 F.2d 41 46 (3d Cir. 1992)); or evidence that the agent misrepresented the nature of the policy (*Parasco*, 870 F.Supp. at 656).

The crux of Leach's argument is that Northwestern improperly denied him disability benefits. An insurer's failure to pay insurance benefits is nonfeasance, and is not actionable under the statute. As to Leach's contention that the insurer promised to pay benefits that it did not intend to pay, the plaintiff offers no evidence to support this assertion. Leach insists that evidence that the insurer "chose the date for retroactive discontinuance based on a blueprint that Mr. Leach reviewed is a clear indication of the arbitrariness of its actions." (Pl.'s Br. Doc. 25 at 15). However, this is merely evidence that the insurer had determined, as a result of its investigation, not to pay benefits past a certain date. It does not speak to the type of fraud courts have found might support a

21

claim under the UTPCPL.  Moreover, plaintiff's argument  is belied by the undisputed fact that Northwestern did pay disability benefits, beginning in September of 1991, for approximately ten years.

We agree with the defendant that there is no evidence from which a reasonable jury could find malfeasance.  Accordingly, plaintiff's motion for summary judgment on this claim must be denied, defendant's motion for summary judgment will granted, and we will dismiss this claim as a matter of law.

### D.  Defendant's Counterclaims

In addition to seeking summary judgment in its favor on plaintiff's claims, Northwestern's motion for summary judgment also argues that summary judgment in its favor is appropriate on its counterclaims for breach of contract, unjust enrichment, misrepresentation, and fraud.

### (1)  Defendant's counterclaim for breach of contract

To maintain its counterclaim for breach of contract under Pennsylvania law, Northwestern must show (1) the existence of a valid and binding contract, (2) that it has complied with the contract and performed its own obligations under it, (3) fulfillment with all conditions precedent, (4) that Leach breached the contract, and (5) that the insurer suffered damages.  *Pierce v. Montgomery County Opportunity Bd., Inc.*, 884 F.Supp. 965 (E.D.Pa.1995).

The crux of Northwestern's counterclaim for breach of contract is that the plaintiff breached the terms of the Policy by misrepresenting the conditions and terms of his alleged disability on his monthly Requests for Continuance of Disability Benefits forms, as of September 1998.  (Counterclaim at ¶ 28).  As a result, the insurer alleges that it overpaid benefits in the amount of $219,271.60.  (Counterclaim at ¶ 30).   This amount includes premiums that Northwestern waived on the Policy while it was paying disability benefits, as well as premiums it waived for Additional Purchase Benefit Policy No.

22

D837021.  (Counterclaim ¶ 27).

We have previously concluded that material issues of fact remain for trial on the question of Leach's disability, precluding summary judgment on plaintiff's claim for breach of contract.  We now find that disputed issues of fact remain on defendant's counterclaim for breach of contract as well, as it involves the same contradictory evidence and testimony that must be considered with respect to plaintiff's breach of contract claim.  Accordingly, we will deny summary judgment on Count I of defendant's counterclaim.

### (2) Defendant's counterclaim for unjust enrichment

Count II of Northwestern's counterclaim is a claim for unjust enrichment based on two other disability policies, D 558603 and D827021.  Northwestern seeks a judgment that these policies  lapsed as of May 2, 2001 and are no longer in force and effect, and that the plaintiff was not disabled under the terms of the policies from and after September of 1998.  (Def.'s Mot. at ¶ 8).  Whether Leach was disabled from September 1998 is inseparable from the ultimate issue of disability, which we have concluded is for the jury to decide, and we will deny defendant's motion for summary judgment on this counterclaim

### (3) Defendant's counterclaims for fraud and misrepresentation

Northwestern's counterclaim for misrepresentation alleges that Leach "intended to deceive and defraud Northwestern by falsely and fraudulently representing his physical and/or medical condition and activities." (Counterclaim ¶37).  The basis for the insurer's counterclaim for fraud is that Leach made false, fraudulent, and malicious representations, which induced Northwestern to make disability payments to the plaintiff and to waive the premiums for his policies.

The issues presented in these claims are bound up with the ultimate issue of disability, including disputed facts regarding his occupation, his conduct while receiving

23

disability payments, and various medical evidence which we have concluded is for the jury to decide. Therefore we will deny defendant's motion for summary judgment on Counts III and IV of defendant's counterclaim.

**(4) Defendant's request for declaratory relief**

In Count V of the counterclaim, defendant seeks a declaration that the plaintiff is not entitled to the relief sought in the "Wherefore" clause of the complaint, which claims that he is entitled to a judgment against Northwestern for $6,137.82 per month commencing January 1, 2002. Such payment would be based upon the continuation of disability benefits under the Policy. Any such declaration must await a jury's determination that Leach is entitled to payments under the Policy, and we will deny summary judgment on this count of defendant's counterclaim.

**IV.  Conclusion**

For the reasons set forth above, plaintiff's breach of contract claim presents disputed issues of fact for a jury to decide. Plaintiff has failed to state a claim for bad faith or deceptive business practices, and summary judgment shall be granted against the plaintiff and in favor of the defendant on these claims. Accordingly, plaintiff's motion for summary judgment (Doc. 17) will be denied in its entirety. Defendant's motion for summary judgment (Doc. 19) will be denied as to plaintiff's breach of contract claim, and granted as to plaintiff's bad faith and deceptive business practices claims. Defendant's motion for summary judgment on Counts I through V of its counterclaim shall be denied.

An appropriate Order follows.

 

 

 

__December 22, 2005_____          __s/___Maurice B. Cohill, Jr._____

        Date                                        Maurice B. Cohill, Jr.
                                                     Senior United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARK J. LEACH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **Civil Action No. 01-2364** |
| | ) |
| **NORTHWESTERN MUTUAL** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

AND NOW, to-wit, this __22nd___ day of December, 2005, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

Plaintiff's Motion for Summary Judgment (Doc. 17) be and hereby is DENIED in its entirety. Plaintiff's breach of contract claim remains to be tried to a jury. Plaintiff's claims for bad faith and unfair trade practices be and hereby are dismissed as a matter of law.

Defendant's Motion for Summary Judgment (Doc. 19) be and hereby is DENIED IN PART and GRANTED IN PART as follows:

Summary Judgment be and hereby is DENIED as to plaintiff's breach of contract claim, and this claim remains to be tried to a jury;

Summary Judgment be and hereby is GRANTED in favor of the defendant and against the plaintiff on plaintiff's claim of bad faith in violation of 42 Pa.C.S. § 8371, and this claim be and hereby is dismissed as a matter of law;

Summary Judgment be and hereby is GRANTED in favor of the defendant and against the plaintiff on plaintiff's claim of deceptive business practices in violation of 73 Pa.C.SA. § 201-1, and this claim be and hereby is dismissed as a matter of law; and

Summary Judgment be and hereby is DENIED as to all counts of defendant's counterclaim. These claims remain to be tried to a jury.

   s/ Maurice B. Cohill, Jr._____
Maurice B. Cohill, Jr.
Senior United States District Judge